J-A22033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KWILSON COLEMAN | |
| Appellant | No. 1415 MDA 2019 |

Appeal from the Judgment of Sentence entered April 4, 2019
In the Court of Common Pleas of York County
Criminal Division at No: CP-67-CR-0000448-2009

BEFORE: SHOGAN, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.: **FILED NOVEMBER 19, 2020**

Appellant, Kwilson Coleman, appeals from the judgment of sentence imposed in the Court of Common Pleas of York County on April 4, 2019, following Appellant's conviction, upon retrial, of first-degree murder. Appellant challenges the sufficiency of evidence, the weight of the evidence, the legality of his sentence, and an evidentiary ruling. Upon review, we affirm.

This case stems from a murder that occurred in York City in the early morning hours of Friday, November 27, 2008, when Appellant was 17 years old. Although the facts will be discussed in greater detail herein, for context we repeat here an abridged version included in the Commonwealth's memorandum of law in support of sentencing recommendations.

> [Appellant] shot the victim, Greg Wright, multiple times after the victim tried to rob a third person. Four bullets struck the victim, shattering [] his arm and femur and penetrating through the

victim's heart, lungs, diaphragm, and liver. Prior to his death, the victim tried to flee from [Appellant], at one point "crab–walking" away, pleading for [Appellant] not to shoot and asking for his mother. [Appellant] continued to shoot at the victim, stalking the victim from the top of the porch to the street.

Commonwealth's Memorandum of Law in Support of Sentencing Recommendations, 4/3/19, at 2.

When Appellant was initially tried and convicted of first-degree murder in 2009, he was sentenced to life in prison without the possibility of parole ("LWOP"). Following unsuccessful direct appeal efforts, he sought state post-conviction collateral relief as well as federal habeas corpus relief. His challenge filed in federal court centered on claims of an illegal sentence in light of *Miller v. Alabama*, 567 U.S. 460 (2012), and issues relating to "alleged vagaries in eyewitness identification [by Commonwealth witness Melanie Miller and] questions regarding the disclosure of a photo array at trial[.]" *Coleman v. Glunt*, No. 3:13-CV-1699 (M.D. Pa.), Report and Recommendation of the Magistrate Judge, 2/1/18, at 2. "[I]n a commendable display of candor, the Commonwealth [] notified the court that it agrees that it is in the best interests of justice to grant Coleman's petition for writ of habeas corpus and remand" the case to York County for retrial. *Id.* By order entered on February 26, 2018, the United States District Court for the Middle District of Pennsylvania adopted the magistrate judge's Report and Recommendation in its entirety, granted the writ of habeas corpus conditionally, vacated Appellant's conviction and sentence, and remanded to the Court of Common Pleas of York County

for retrial. ***Coleman v. Glunt***, 2018 WL 1129598 (M.D. Pa., February 26, 2018).

Appellant was retried in July 2018 and the jury convicted him of first-degree murder and third-degree murder. A pre-sentence report was ordered. At the conclusion of a sentencing hearing conducted on April 4, 2019, the court imposed a sentence of 56 years to life in prison.[1] This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925. Appellant asks us to consider four issues, which we have reordered for ease of discussion:

   I.   Whether the evidence was insufficient to support the jury's verdict as to [first-degree murder[2]] on the following grounds: there being no other competent or compelling evidence the testimony of Marshi Martin was so contradictory and unreliable that, without any other competent evidence, left the jury to decide the matter based upon pure conjecture, speculation and assumption.

   II.   Whether as to [first-degree murder[3]], the verdict was against the greater weight of the evidence so as to shock one's sense of justice on the following grounds: there being

_____

[1] The court also imposed a concurrent sentence for third-degree murder. In its Memorandum issued in response to Appellant's post-sentence motion, the trial court ordered that the sentence for third-degree murder be vacated, acknowledging that the third-degree murder conviction should have merged with the first-degree murder conviction for sentencing purposes. However, because the sentence for third-degree murder was to run concurrently with the first-degree murder sentence, the court suggested Appellant had not suffered any prejudice. Trial Court Memorandum, 8/6/19, at 16-17.

[2-3] Although Appellant framed his sufficiency and weight issues in terms of "Counts 1 and 2," *i.e.*, first-degree and third-degree murder, respectively, we shall restrict our analysis to first-degree murder. ***See*** n. 1.

no other competent or compelling evidence the testimony of Marshi Martin was so contradictory and unreliable that, without any other competent evidence, left the jury to decide the matter based upon pure conjecture, speculation and assumption.

III. Appellant submits this Honorable Court erred and abused its discretion in sentencing the Appellant to 56 years to life without the possibility of parole on the following grounds:

   a. The court erred in applying the newly enacted sentencing guidelines in that the guidelines de-individualize the sentence to be imposed and results [*sic*] in a *de facto* life sentence;

   b. The newly enacted sentencing guidelines are unconstitutional in that they de-individualize the sentence to be imposed and results [*sic*] in a *de facto* life sentence;

   c. The newly enacted guidelines are not consistent with the principles set forth in ***Miller v. Alabama*** and ***Batts I*** and ***Batts II***[4] in that they constrain the court to enter a *de facto* life sentence;

   d. The imposition of a lifetime parole tail on a juvenile lifer is illegal in that a lifetime tail of parole is unconstitutional and violates the mandates of ***Miller v. Alabama*** and ***Montgomery v. Louisiana***[5], in that it is not an individualized sentence.

IV. Whether the trial court erred in admitting the hearsay testimony of Gerard Kinard by admitting said testimony under the excited utterance exception under the Pennsylvania Rules of Evidence.

Appellant's Brief at 4.

---

[4] ***Commonwealth v. Batts***, 66 A.3d 286 (Pa. 2013) and ***Commonwealth v. Batts***, 163 A.3d 410 (Pa. 2017), respectively.

[5] ***Montgomery v. Louisiana***, 136 S.Ct. 718, 736 (2016).

In his first issue, Appellant asserts the evidence was insufficient to support the jury's verdict of guilty on the first-degree murder charge. As this Court has explained:

Our standard of review regarding challenges to the sufficiency of the Commonwealth's case is well settled. "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." **Commonwealth v. Patterson**, [625 Pa. 104], 91 A.3d 55, 66 (2014) (citation omitted). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." **Commonwealth v. Watley**, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied,* [95 A.3d 277 (Pa. 2014)]. As an appellate court, we must review "the entire record . . . and all evidence actually received[.]" **Id.** "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." **Commonwealth v. Kearney**, 92 A.3d 51, 64 (Pa. Super. 2014) (citation omitted). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Diamond**, [623 Pa. 475], 83 A.3d 119, 126 (2013) (citation omitted).

**Commonwealth v. Brooker**, 103 A.3d 325, 330 (Pa. Super. 2014).

With respect to murder, the relevant statute provides:

(a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
. . . .

(d) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection:
    . . . .

- 5 -

"Intentional killing." Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa.C.S.A. § 2502.

In **Commonwealth v. Arrington**, 86 A.3d 831 (Pa. 2014), our Supreme Court explained the Commonwealth's burden as follows:

In order to sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. Specific intent and malice may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body.

*Id.* at 840.

In challenging the sufficiency of the Commonwealth's evidence, Appellant argues the only evidence linking Appellant to the murder was testimony from Commonwealth witness Marshi Martin that was "inherently unreliable" because Mr. Martin recanted the testimony at a prior PCRA hearing and at Appellant's 2018 retrial. Appellant's Brief at 18. Consequently, the verdict was based on "mere speculation and assumptions [and] should be set aside." *Id.*

In its Memorandum issued in response to Appellant's post-sentence motion, the trial court provided a synopsis of Mr. Martin's trial testimony in the course of analyzing Appellant's sufficiency challenge. The court noted:

Commonwealth witness Marshi Martin admitted that he made a recorded statement with Detective Spence[6] on December 3, 2008 (about a week after the incident). Mr. Martin also admitted testifying at a "prior proceeding" under oath in 2009 ([Appellant's] first jury trial). At the interview with Detective Spence, Mr. Martin admitted to being outside of Gerard Kinard's residence on the night in question, along with Corry Brooks, Gregory Wright (the Victim), Gerard Kinard, and [Appellant]. Mr. Martin also identified [Appellant] as the shooter of the Victim at both the interview with Detective Spence and at the prior proceeding. Also from the prior recorded statement with police, Mr. Martin referenced a phone call between [Appellant] and Corry Brooks that he walked in on, wherein he heard them talking about the incident and he heard [Appellant] ask Corry if he was all right, and [Appellant] stated that "it did not have to go down like that, but he was hitting you with the gun;" "I'm not gonna let nobody just sit there, hit you with no gun." This implies an admission by [Appellant] that he shot the Victim because the Victim was hitting Corry Brooks with a gun. When [the prosecutor] read all of these prior statements at trial and questioned Mr. Martin about those statements, he admitted that [the prosecutor] had read them correctly from the transcript.

At a later hearing in 2011 (PCRA hearing), and at [Appellant's] second jury trial (July 2018), Mr. Martin recanted his previous statements by claiming he lied to police in 2008 and at the first trial in 2009, and that [Appellant] wasn't even there that evening. At the July 2018 trial, the Commonwealth used Mr. Martin's prior statement to police and prior testimony from [Appellant's] first trial to impeach him and as substantive evidence. "[A] prior inconsistent statement may be used as substantive evidence only when the statement is given under oath at a formal legal proceeding; or the statement has been reduced to a writing and signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements." *Com. v. Lively*, 530 Pa. 464, 471, 610 A.2d 7, 10[-11] (1992). In the instant case, Mr. Martin's statement from a "prior proceeding" was given under oath at [Appellant's] first trial (a formal legal proceeding). The prior statement given to

_____

[6] At the time of the 2008 murder, Detective Spence was the Detective Sergeant Supervisor for the York City Police Violent Crimes Unit. Notes of Testimony ("N.T."), Trial, at 182.

Detective Spence on December 3, 2008 was a contemporaneous verbatim recording of that statement, which had been transcribed. As a result, both of these statements were admissible for impeachment purposes as well as substantive evidence.

It was up to the jury, as the fact-finder, to decide which statements by Mr. Martin, if any, were credible. At the July 2018 trial, Mr. Martin:

- Admitted making the statement to Detective Spence on December 3, 2008; and

- Remembers testifying at another proceeding in 2009;

- Agreed that December 3, 2008 and 2009 are closer in time to the shooting date than 2011 (the PCRA hearing where Mr. Martin recanted);

- Agreed that what he told Detective Spence in 2008 was similar to what he testified to in 2009.

Mr. Martin also claimed at trial that right before testifying at the 2009 proceeding, he told them he had lied back in 2008. He further claimed that they threatened to put him in jail if he did not go forward with his testimony. Upon further questioning, Mr. Martin admitted that he did not tell the court he was lying in 2009, but claimed that he told the detectives before he went into the courtroom that he was lying and that he did not want to testify. However, he claimed he could not remember which detective he told prior to that proceeding that he was lying, and he further admitted that after telling the unknown detective that he was lying and did not want to testify:

- He then took the stand; and

- He then swore to tell the truth; and

- He then gave testimony that was similar to the statement he made in December 2008 wherein he identified [Appellant] as the shooter.

Trial Court Memorandum, 8/6/19, at 2-5 (references to notes of testimony and some capitalization omitted).

Appellant's assertion that Mr. Martin's 2008 statement and 2009 testimony were the only links to Appellant's role in the homicide is contradicted by the testimony of Detective Spence and other witnesses. Despite Mr. Martin's suggestion that Appellant was not present on the night of the shooting, Detective Spence recounted Gerard Kinard's statement that Appellant and Mr. Martin attempted to get into Kinard's house "right after the shooting." N.T., Trial, at 199.[7] Moreover, Detective Spence stated that Mr. Martin came to the police station on his own after the detective contacted Mr. Martin's mother. According to Detective Spence, Mr. Martin "was glad we reached out to him. And near the end of it, he said he was scared. He didn't want to be put in the middle of this situation, so we offered to get him some counseling and help. It was never confrontational at all." *Id.* at 200.

Detective Spence explained that the situation was hard on Mr. Martin because he and Appellant had been friends for a long time, "since school." *Id.*

---

[7] Kinard testified that he an Appellant are cousins. N.T., Trial, at 126.

Even so, Mr. Martin admitted to the detective that Appellant "was the one shooting." *Id.*

Jennifer Myers also testified. She explained that she lived across the street from Gerard Kinard's house. She heard voices outside and looked out her window. She witnessed the shooting and heard at least five shots but did not see the shooter's face because his back was to her. She did provide a description of the shooter's clothing (a black hoody and dark pants) and his height (around 5' 7" to 5' 9") relative to the victim (a tall, thin Black male) and a third individual (a white boy who was shorter than the victim). *Id.* at 175-77. Her testimony regarding the height of the persons involved was consistent with the height of Appellant and of his victim, according to the testimony of both Detective Spence and the forensic pathologist. *Id.* at 201, 111.

Viewed in a light most favorable to the Commonwealth as verdict winner, we find the Commonwealth provided evidence—both direct and circumstantial—proving that Greg Wright was unlawfully killed; that Appellant was responsible for the killing; and that Appellant acted with malice and a specific intent to kill. Contrary to Appellant's assertion, the jury was not constrained to reach a verdict based on conjecture, speculation, and assumption. The evidence, along with all reasonable inferences drawn from that evidence, supports the jury's verdict of first-degree murder beyond a

reasonable doubt. Appellant is not entitled to relief on his sufficiency of evidence issue.

In his second issue, Appellant argues the guilty verdict on first-degree murder charges was against the weight of the evidence. Our Supreme Court has instructed:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); *Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Widmer*, 560 Pa. at 319–20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Id.* at 320, 744 A.2d at 752 (citation omitted).

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013). "A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Widmer*, 744 A.2d at 751.

This Court is not to step into the shoes of the trial court to revisit the question of whether the verdict was against the evidence. Rather, our task is to "analyze whether the trial court abused its discretion by reaching a manifestly unreasonable judgment, misapplying the law, or basing its decision on partiality, prejudice, bias, or ill-will." *Clay*, 64 A.3d at 1056 (citing *Widmer*, 744 A.2d at 753). As the trial court recognized, "Relief on a weight

- 11 -

of the evidence claim is reserved for 'extraordinary circumstances, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'" Trial Court Memorandum, 8/6/19, at 10 (quoting **Commonwealth v. Sanchez**, 36 A.3d 24, 27 (Pa. 2011)).

Appellant suggests that Commonwealth witness Marshi Martin was the only witness who identified Appellant as the shooter. He contends that Mr. Martin's testimony to that effect at Appellant's original trial was refuted by Mr. Martin at Appellant's retrial. At retrial, Mr. Martin insisted he testified "untruthfully" at the first trial and was untruthful in identifying Appellant as the shooter when he was interviewed by detectives. Appellant's Brief at 16. Because Commonwealth witness Jennifer Myers was unable to identify the shooter, "[t]he verdict could have only been based upon the testimony of Marshi Martin." **Id.** Under the circumstances, Appellant posits, "the jury was left to decide the matter purely upon conjecture, speculation and assumption." **Id.**

The trial court rejected Appellant's assertions, determining the verdict "was not based on speculation, conjecture, and assumption, but on the direct and circumstantial evidence that was presented." Trial Court Memorandum 8/6/19, at 10. Based on our review, we find no abuse of discretion in the trial court's conclusion that "the jury's verdict is not so contrary to the evidence as to shock the conscience of the court." Trial Court Memorandum, 8/6/19, at

10 (some capitalization omitted). Appellant's weight of the evidence claim fails.

Appellant next raises four interrelated sub-issues in challenging the legality of the sentence imposed, *i.e.*, a term of imprisonment of 56 years to life. He argues the court erred in applying the "newly enacted sentencing guidelines" because they de-individualize the sentence and result in a *de facto* life sentence, and he claims the guidelines are unconstitutional. He further asserts the guidelines are inconsistent with case law (including **Miller**[8]), constraining the court to enter a *de facto* life sentence, and contends the imposition of a lifetime parole tail is unconstitutional because it is not individualized.

As this Court reiterated in **Commonwealth v. Clary**, 226 A.3d 571 (Pa. Super. 2020):

---

[8] **Miller** requires examination of the following factors when sentencing a juvenile facing a potential LWOP sentence:

> At minimum it should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

**Batts II, 163 A.3d** at 421 n.5 (citations and alterations omitted).

> A claim challenging a sentencing court's legal authority to impose a particular sentence presents a question regarding the legality of the sentence. **Commonwealth v. Hernandez**, 217 A.3d 873, 878 (Pa. Super. 2019). "The determination as to whether a trial court imposed an illegal sentence is a question of law; an appellate court's standard of review in cases dealing with questions of law is plenary." **Id.** (citation omitted).

**Id.** at 580-81.

Initially we note that, unlike many of the cases cited by the trial court and the parties, this case does not involve a remand for resentencing in light of **Miller** and/or **Montgomery**.[9] Rather, the sentence at issue here is one imposed following the 2018 retrial, which resulted in Appellant's conviction. The sentencing provisions applicable to Appellant's 2018 conviction went into effect on October 25, 2012, and provide in relevant part:

---

[9] In **Miller**, the United States Supreme Court in 2012 held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." **Miller**, 132 S.Ct. at 2464. Four years later, in 2016, the Court determined that "**Miller** announced a substantive rule that is retroactive in cases on collateral review." **Montgomery**, 136 S.Ct. at 732. While these decisions formed the basis for vacating Appellant's original sentence, Appellant's case was not remanded for sentencing. Rather, his case was remanded for a new trial and is before this Court on direct appeal. Therefore, **Montgomery** is not implicated.

Further, we note that "[o]ur Supreme Court has held that in fashioning a minimum sentence [for juveniles who committed first-degree murder prior to June 24, 2012], courts have discretion but 'should be guided by the minimum sentences contained in Section 1102.1(a)[.]'" **Commonwealth v. Blount**, 207 A.3d 925, 934 n.5 (Pa. Super. 2019) (quoting **Batts II**, 163 A3d at 458).

**(a) First degree murder.--**A person who has been convicted after June 24, 2012, of a murder of the first degree . . . and who was under the age of 18 at the time of the commission of the offense shall be sentenced as follows:

(1) A person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life.

. . . .

**(e) Minimum sentence.--**Nothing under this section shall prevent the sentencing court from imposing a minimum sentence greater than that provided in this section. Sentencing guidelines promulgated by the Pennsylvania Commission on Sentencing may not supersede the mandatory minimum sentences provided under this section.

18 Pa.C.S.A. § 1102.1.

The trial court examined each of the factors set forth in 18 Pa.C.S.A. § 1102.1(d), *see* N.T., Sentencing, at 77-84, and determined that a LWOP sentence would be "inappropriate" for Appellant because "there was not proof beyond a reasonable doubt that [Appellant] was irreparably corrupted." Trial Court Memorandum, 8/6/19, at 11-12. The court instead imposed a sentence of 56 years to life, a sentence that was in the standard range for a person older than 15 but younger than 18 with a Prior Record Score of five and an Offense Gravity Score of 15. As the court explained:

This contemplates that after serving his minimum sentence (56 years), [Appellant] would be eligible for parole, but may, in fact, end up serving a life sentence if the Parole Board determines that he is not entitled to parole. . . . Despite [Appellant's] repeated contentions to the contrary, his sentence is neither "de facto" nor is it "de-individualized."

- 15 -

***Id.***[10]

In ***Commonwealth v. Ligon***, 206 A.3d 1196 (Pa. Super. 2019), this Court

clarified that

> [***Miller***] did not hold that life sentences with parole eligibility are unconstitutional, or that juvenile murderers must be released at some point regardless of their fitness to rejoin society.

---

[10] We note that our Supreme Court granted a petition for allowance of appeal in ***Commonwealth v. Felder***, 18 EAP 2018, after this Court affirmed Felder's sentence imposed for first-degree murder.  The Court agreed to consider the following question:

> Does not a sentence of 50 years to life imposed upon a juvenile constitute a *de facto* life sentence requiring the sentencing court, as mandated by this Court in ***Commonwealth v. Batts***, 163 A.3d 410 (Pa. 2017) ("***Batts II***"), first find permanent incorrigibility, irreparable corruption or irretrievable depravity beyond a reasonable doubt?

However, while the sentencing court is to be guided by Section 1102.1 when resentencing for a conviction predating June 24, 2012, ***see*** n. 9, Section 1102.1 itself does not apply to Felder, whose March 2012 conviction predated enactment of the provisions.  Appellant, by contrast, was convicted in 2018 and, as such, the sentencing provisions of Section 1102.1 apply to him.  This distinction is important because the sentencing guideline range for Appellant starts at 56 years.  ***See*** 204 Pa. Code § 303.16(b).

We further note that our Supreme Court entered a *per curiam* order on March 31, 2020, placing a hold on the ***Felder*** appeal pending ***Jones v. Mississippi***, 285 So.3d 626 (Miss. Ct. App. 2017), *cert. granted*, 140 S.Ct. 1293 (2020). As reflected in the Petitioner's Brief in ***Jones***, the question before the United States Supreme Court is "[w]hether the Eighth Amendment requires the sentencing authority to make a finding that a juvenile is permanently incorrigible before imposing a sentence of life without parole."  Petitioner's Brief at i, 2020 WL 3106513.  In ***Jones***, the Petitioner contends the Mississippi court refused to determine whether the "juvenile homicide offender is permanently incorrigible" before imposing his sentence of life without parole, as required by ***Montgomery*** and ***Miller***.  ***Id.*** at 1.

Thus, a sentence with a term of years minimum and a maximum sentence of life does not violate **Miller**'s individualized sentencing requirement, because it properly leaves the ultimate decision of when a defendant will be released to the parole board.

**Id.** at 1200. Further, as our Supreme Court stated in **Batts II**,

Section 1102.1(a) requires the imposition of a mandatory minimum sentence for juveniles convicted of first-degree murder. Subsection (e) makes clear that this is only the minimum sentence required, stating, "Nothing under this section shall prevent the sentencing court from imposing a minimum sentence greater than that provided in this section." 18 Pa.C.S. § 1102.1(e).

In determining the minimum sentence for a juvenile convicted of first-degree murder prior to **Miller**, a sentencing court is to exercise its discretion to find the appropriate, individualized sentence in each case, just as it would when fashioning the minimum sentence for any other defendant before it. **See Commonwealth v. Gordon**, 596 Pa. 231, 942 A.2d 174, 182 (2007) ("Pennsylvania judges retain broad discretion to sentence up to and including the maximum sentence authorized by statute; the only line that a sentence may not cross is the statutory maximum sentence."); **Commonwealth v. Walls**, 592 Pa. 557, 926 A.2d 957, 966–67 (2007) (stating that sentencing in Pennsylvania is individualized, requiring the sentencing court to consider certain factors and to provide an explanation of its reasoning prior to imposing a given sentence).

**Batts II**, 163 A.3d at 443 (footnote omitted).

In **Clary**, the trial court initially imposed the mandatory LWOP sentence following Clary's 2000 convictions for murder, attempted murder, and gun violations. Upon resentencing in the wake of **Miller** and **Montgomery**, the court imposed an aggregate sentence of 48 years to life. On appeal, Clary asserted that while the court did not impose a LWOP sentence, his sentence

constituted an impermissible *de facto* life sentence in violation of **Miller**.

**Clary**, 226 A.3d at 580. This Court rejected his claim, explaining:

> A trial court may not impose a term-of-years sentence on a juvenile convicted of homicide that equates to a *de facto* LWOP sentence unless it finds, beyond a reasonable doubt, that the juvenile is incapable of rehabilitation. **Miller**, 567 U.S. at 479, 132 S.Ct. 2455; **Commonwealth v. Foust**, 180 A.3d 416, 433 (Pa. Super. 2018).
>
> . . . .
>
> This court has distinguished between individual term-of-years sentences which constitute *de facto* LWOP sentences and those that do not. **Foust**, **supra** at 438. In **Foust**, this Court concluded that a 150-year sentence is a *de facto* LWOP sentence and a 30 years' to life sentence does not constitute a *de facto* LWOP sentence. **Id.**
>
> For sentences that fall between the clearly constitutional and unconstitutional parameters, we have concluded that a sentence is not a *de facto* LWOP sentence where there is "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." **Commonwealth v. Bebout**, 186 A.3d 462, 467 (Pa. Super. 2018) (citation omitted). Thus, "it must at least be plausible that one could survive to the minimum release date with some consequential likelihood that a non-trivial amount of time at liberty awaits." **Id.** at 468 (emphasis omitted). If there is no meaningful opportunity for parole, the sentence constitutes a *de facto* LWOP sentence. **Id.** We[] therefore consider the age the appellant would be eligible for parole to determine whether the new sentence is the functional equivalent of LWOP. **Id.**
>
> In **Commonwealth v. Anderson**, 224 A.3d 40, 47-48 (Pa. Super. 2019), a post-**Miller** case, the appellant received a sentence of 50 years' to life imprisonment upon resentencing. [**Id.**] at 41-42. Because Anderson was 17 years old at the time he began serving his sentence, he would, thus, be eligible for parole at age 67. **Id.** at 46-47. We, therefore, concluded that his sentence was not the functional equivalent of LWOP. **Id.** at 47-48. **See also Bebout**, **supra** at 468 (concluding the appellant's 45 years' to life sentence in which he would be eligible for parole at the age of 60 was not *de facto* LWOP); **Commonwealth v.**

> *Lekka*, 210 A.3d 343, 357-58 (Pa. Super. 2019) (concluding that because the appellant's term of 45 years' to life imprisonment rendered him eligible for parole at the age of 62, it was not a *de facto* LWOP sentence); *Foust, supra* at 438, 441 (concluding that the appellant's two consecutive 30 year to life sentences were not a *de facto* LWOP sentence and noting that even considering Appellant's aggregate sentence, he had a chance of being released into society in his 70s).

*Id.* at 581. Further, "our cases have concluded that even the chance of parole when a defendant is in his or her eighties is not the equivalent of a life sentence." *Commonwealth v. Brooker*, 103 A.3d 325, 340 (Pa. Super. 2014) (citing *Commonwealth v. Dodge*, 77 A.3d 1263, 1275 (Pa. Super. 2013) (concluding a sentence allowing a defendant to be paroled in his early eighties, while lengthy, is not the equivalent of a life sentence)).

The trial court considered whether a sentence of 56 years to life constituted a *de facto* LWOP sentence and concluded it did not. As the court observed:

> In the instant case, [Appellant] will be approximately 72 years of age when he becomes eligible for parole. As in *Bebout*, [Appellant's] opportunity for release is meaningful, especially in light of the gravity of his crime. Moreover, for [Appellant] in this case, despite being 12 years older than Bebout when he will be eligible for parole, it is at least **plausible** that he could survive until the minimum release date with some consequential likelihood that a non-trivial amount of time at liberty awaits. And, similar to the defendant in *Bebout*, at the age of 72, [Appellant] in this case has the potential to live for several decades outside of prison if paroled at his minimum. As a result the court's sentence of 56 years to life is not a *de facto* LWOP sentence.

Trial Court Memorandum, 8/6/19, at 15 (emphasis in original; some capitalization omitted). Moreover, just as in *Bebout*, Appellant "has failed to

demonstrate that he has no plausible chance of survival until his minimum release date." *Hernandez*, 217 A.3d at 879. Therefore, we reject Appellant's contention that applying the sentencing guidelines in his case de-individualizes his sentence or results in a *de facto* life sentence.

Moreover, as we recognized in *Ligon*,

The *Miller* Court did not call into question the ability of state parole boards to make the decision as to whether a juvenile murderer should be paroled and did not equate a sentence of LWOP with one for life with the possibility of parole. *Montgomery*, *supra* at 736. In fact, it did the opposite, merely requiring the states to make the relevant inmates parole eligible, thereby insuring that those prisoners who have shown the ability to reform will receive a meaningful opportunity for release.

*Ligon*, 206 A.3d at 1200.

Again, *Miller* "did not hold that life sentences with parole eligibility are unconstitutional[.]" *Id.* As we explained in *Commonwealth v. Lawrence*, 99 A.3d 116 (Pa. Super. 2014), "Section 1102.1 does not offend the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Id.* at 121. *See also Brooker*, 103 A.3d at 339. Moreover,

"[D]uly enacted legislation carries with it a strong presumption of constitutionality." *Lawrence*, 99 A.3d at 118. We will not find a statute violative of the Eight Amendment's prohibition on cruel and unusual punishment unless it calls for a sentence so greatly disproportionate to an offense as to offend evolving standards of decency or a balanced sense of justice.

*Commonwealth v. Smith*, 210 A.3d 1050, 1062 (Pa. Super. 2019) (internal citations and quotations omitted). Appellant's assertions that the guidelines

are inconsistent with case law, including ***Miller***, or that they constrain the trial court to enter a *de facto* life sentence are unfounded.

We also dismiss Appellant's argument that imposition of a lifetime parole tail is unconstitutional because it is not individualized. This Court rejected a similar argument in ***Hernandez***, holding that

> [f]or those defendants convicted of first or second-degree murder prior to June 25, 2012, for whom the sentencing court determines a life without parole sentence is inappropriate, it is our determination here that they are subject to a mandatory maximum sentence of life imprisonment as required by Section 1102.1(a), accompanied by a minimum sentence determined by the common pleas court upon resentencing.

***Hernandez***, 217 A.3d at 879 (quoting ***Commonwealth v. Blount***, 207 A.3d 925, 938 (Pa. Super. 2019) (citing ***Commonwealth v. Seskey***, 170 A.3d 1105, 1108 (Pa. Super. 2017) (additional citations and brackets omitted)). The same rationale applies to the sentence imposed in accordance with 18 Pa.C.S.A. 1102.1 for Appellant's 2018 conviction. Appellant's sentencing claims, including his claims of unconstitutionality, fail.

In his fourth and final claim, Appellant contends the trial court erred in admitting testimony of Commonwealth witness Gerard Kinard under the excited utterance exception to the hearsay rule. In his brief, he argues—without citation to authority—that Kinard's testimony does not qualify as an excited utterance because Kinard was repeating the statements made by others that Appellant and Martin were trying to get into the Kinard home.

It is well-settled the "[a]n appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay . . . is abuse of discretion." *Commonwealth v. Walter*, 93 A.3d 442, 449 (Pa. 2014). We will not disturb an evidentiary ruling unless "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by evidence of record." *Commonwealth v. Cooper*, 941 A.2d 655, 667 (Pa. 2007) (citation omitted).

As the trial court recognized, to qualify as an excited utterance, a statement must be

> a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties. . . . Thus, it must be shown first, that the declarant had witnessed an event sufficiently startling and so close in point of time as to render [his] reflective thought processes inoperable and, second, that [his] declarations were a spontaneous reaction to that startling event.

Trial Court Rule 1925(a) Opinion, 10/25/19, at 3 (quoting *Commonwealth v. Stokes*, 615 A.2d 704, 712 (Pa. 1992) (additional citation and alterations omitted)). As this Court has explained:

> An excited utterance, as an exception to the hearsay rule, is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Pa.R.E., Rule 803(2), 42 PA. CONS. STAT. ANN. The Comment to this exception states that "[t]his exception has a more narrow base than the exception for a present sense

impression, because it requires an event or condition that is *startling.*" *Id.*, Comment–1998 (emphasis in original).

**Commonwealth v. Hood**, 872 A.2d 175, 181 (Pa. Super. 2005).

At trial, Gerard Kinard testified that after hearing several shots fired, "everybody in my house was scared. We didn't know what was going on. We didn't know who was shooting or what was happening." N.T., Trial, at 122. The testimony permitted over the objection of defense counsel involved Kinard's statement "that people in his house were yelling that [Appellant] and Marshi Martin were trying to get into Mr. Kinard's house." Trial Court Rule 1925(a) Opinion, 10/25/19 at 3 (citing N.T., Trial, at 123-26). The trial court acknowledged the statement made by Kinard was, in fact, hearsay. However,

> [a]t the time those declarations were uttered, [Appellant] had just fired numerous shorts at the Victim directly outside of Mr. Kinard's house, and [Appellant] and Marshi Martin were trying to get into the house. These circumstances clearly indicate an unexpected and shocking occurrence to the people inside that house. Moreover, the declarations were made by those individuals very close in time and place to that shocking occurrence, so as to render their reflective thought processes inoperable, and their declarations were a spontaneous reaction to that startling event.

*Id.* at 3-4.

We find no abuse of discretion in the trial court's allowance of Kinard's hearsay testimony under the excited utterance exception. A declarant may testify to the excited utterance of a third party. *See, e.g., Commonwealth v. Murray*, 83 A.3d 137, 156-58 (Pa. 2013); *Commonwealth v. Sherwood*, 902 A.2d 483, 495-96 (Pa. 2009) (recognizing witness testimony as to

statement made by third party as an excited utterance and exception to the hearsay rule). Appellant is not entitled to relief.

Appellant's issues do not afford him any relief. Therefore, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2020